RAHMAN WILSON,

                            Petitioner,

            - versus -

JOSEPH T. SMITH,
Superintendent,

                            Respondent.

MEMORANDUM
AND ORDER
14-CV-3209 (JG)

A P P E A R A N C E S:

       RAHMAN WILSON
           09A2869
           Shawangunk Correctional Facility
           200 Quick Road
           PO Box 700
           Wallkill, NY 12589
      By:   *Petitioner, pro se*

       KEN THOMPSON
           District Attorney, Kings County
           350 Jay Street, Renaissance Plaza
           Brooklyn, New York 11201
      By:   Marie-Claude Palmieri Wrenn
           *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

       Rahman Wilson petitions under 28 U.S.C. § 2254 for a writ of habeas corpus. Wilson is presently incarcerated pursuant to a New York state criminal conviction and sentence of two consecutive twenty-year terms of imprisonment following a trial for murder. He now argues that he was denied federal constitutional rights before, during, and after trial. I heard oral argument on the motion on January 20, 2015, at which Wilson appeared via videoconference. For the reasons given below, Wilson's petition is denied.

BACKGROUND

A.   *Facts of the Crime*

Around 4:05 a.m. on December 27, 2008, a police officer heard shots being fired at a club located at 181 Chester Street in Brooklyn, New York. She responded to the scene and saw that two people, later identified as Jamel Benjamin and Travis Bright, had been shot. Tr. 57-73. Both men died from their wounds.

James Bynum testified that he worked at the club doing cleaning and maintenance. Tr. 129-30. On the night of the shooting, there was a birthday party for Sidney Mitchell. There were about one hundred guests. Tr. 132-36. Around three o'clock in the morning, three men walked in who looked out of place. They went to talk to Mitchell and the woman who paid for the party. Tr. 137-39.

Around 3:30 a.m., Bynum went outside and saw Mitchell, along with some of his friends, talking to the three men. Everything was quiet until about 4 o'clock, and the three men had gone back inside. Everyone started to leave the party. Bynum, who had gone inside after the three men, went back outside. That was when Bynum heard a loud noise that sounded like a metal chair slamming on the floor. Tr. 142-48. When he went inside to investigate, people were running out of the club and he was punched in the face by one of the three men. Tr. 149. At that point, he and several security guards were trying to hold down the man who punched Bynum in the face, and Mitchell said to the man, "you like to shoot people?" Based on this, Bynum thought the man he was holding down had a weapon. Tr. 149-53. While Bynum was holding the man down, the cousin shot him in the head. Tr. 153-56. Bynum started cursing at the shooter, then he watched the shooter run out of the club. Tr. 157-58. Bynum later identified Wilson as the shooter. Bynum had never seen Wilson before that night. Tr. 162-63.

2

Kim Smith also witnessed the shooting. He testified that Sidney Mitchell, a co-worker, invited him to his birthday party on the night of December 26, 2008. Tr. 319-22. Smith said he first saw Wilson about half an hour after Mitchell came to the party, and Wilson was with two other people. One of the men was short and was wearing a gray leather jacket with a logo on the back. Tr. 329-30. When Wilson came in, he went up to Smith and Mitchell. Smith was telling Mitchell about a tattoo on Smith's arm, and Wilson grabbed Smith's arm to point out an area that Wilson thought should be tattooed. Tr. 330-31. At the time, Smith thought Wilson's first name was Ramel, and he knew him as Mitchell's cousin. Wilson worked with Smith at a bus company at the time, and Smith saw him every day for about twenty minutes each morning. Tr. 326-27. Smith and Wilson never spoke, and they did not have any problems. Tr. 328.

Smith testified that around 3:30 or 4:00 a.m., where there were only about five people left on the dance floor, several men arrived who looked out of place. Tr. 325-26. One of the men was shorter than the others, and Wilson went up to him and asked who they were with. The shorter man said, they're with me, they are homies. Tr. 332.

Smith testified that when the party was ending, Wilson and Mitchell had a playful fight on the floor, but everything still seemed to be going well. Then, Smith saw Wilson enter the party with a revolver in his hand. Tr. 333-34. He was with another man, shorter than Wilson, who was saying, "give it back to me," to Wilson. Tr. 341. Wilson told the man, "I'm only going to just scare him." Tr. 336.

Wilson started talking to a man with dreadlocks, later identified as Jamel Benjamin, and telling him to come outside, but Benjamin ignored Wilson. Tr. 335-36; 338-41. Smith saw Wilson shoot Benjamin then go up to security guards who were wrestling with another man and shoot the man the security guards were holding down. Tr. 338-41. After

3

Wilson shot the second person, Smith saw him run out of the club.  Smith also ran out of the club with his girlfriend and called 911.  Tr. 348-49.

When Smith called 911, he told the operator that two men had been shot in the face.  Tr. 354-55.  Smith told the 911 operator that he heard more shots because when the shooter exited the club, he was still firing his gun.  Tr. 355-56.  Smith also told the 911 operator that someone was giving the police a statement who saw the shootings better than Smith did.  When Smith said that, he meant that the other person knew the shooter better than Smith before that evening.  Tr. 356-57.  After Smith called 911, he and his girlfriend stayed until the police and ambulance came, and then they walked home.  Tr. 358.  Smith later identified Wilson in a lineup.  Tr. 364-66.  Smith first identified Wilson as "Ramel," but learned from his girlfriend that his real name was "Rahman."  Tr. 357.

Shakir Afzal was also present the night of the shooting.  Afzal testified that his father runs the nightclub located at 181 Chester Street, known as Platinum 181.  Tr. 265-66.  Afzal said he was outside the club when shots were fired at around 2:00 a.m.; when he heard the shots, he went inside and saw two men lying on the floor.  He did not see anyone shooting and did not see anyone with a gun.  Tr. 269-72.  Afzal's cousin is James Bynum.  Tr. 272.  When Afzal saw the bodies, he called 911.  Tr. 273.  After the police arrived, Afzal went to the station for questioning and then returned to the club to clean up.  When he was cleaning up, he found a bullet located near one of the bodies.  Tr. 275-81.  Afzal called the police, and Detective Parks of the NYPD went to the scene to collect the bullet.  Tr. 474-77.  The medical examiner testified that he recovered another bullet from the body of Jamel Benjamin.  Tr. 111-16.  Detective Wilfredo Torres of the Firearms Analysis Section testified that he examined both bullets and determined they were fired from the same firearm, a .9mm/.38mm caliber.  Tr. 231-46.

4

B.  *Trial Proceedings*

Wilson was charged in Kings County with two counts of first-degree murder, two counts of second-degree murder, and criminal possession of a weapon in the second degree. Wrenn Decl. (ECF No. 7) at ¶ 5. Trial began in July 2010. Only the second-degree murder charges and the weapon charge were submitted to the jury. *Id.* ¶ 6. On August 13, 2010, a jury convicted Wilson of both counts of second-degree murder and the weapon charge. Tr. 910-16. At the end of the trial, the government moved to dismiss the first-degree murder counts. Wrenn Decl. ¶ 6, n.1. On September 3, 2010, the court sentenced Wilson to consecutive terms of twenty-five years' imprisonment for the murder convictions, and a concurrent five-year prison term for the weapon conviction. *Id*. ¶ 7.

C.  *Subsequent Procedural History*

Wilson appealed to the New York Supreme Court's Appellate Division, Second Department. He argued that (1) the prosecution failed to prove his guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; (2) the prosecution impermissibly elicited hearsay evidence to support the testimony; (3) the prosecution improperly impeached a defense witness; and (4) that his sentence was excessive. *See* Wren Decl. Ex. L1 (App. Div. Br.) at 2-3.

On December 5, 2012, the Second Department modified Wilson's sentence, reducing it to two consecutive indeterminate terms of 20 years to life. It otherwise affirmed the trial court's decision. *People v. Wilson*, 955 N.Y.S.2d 362, 363 (2d Dep't 2012). The appellate court found that Wilson's argument regarding insufficient evidence was unpreserved for review. *Id.* at 364. It also found that Wilson's argument that the prosecution impermissibly elicited hearsay testimony was unpreserved. It did note that it was error to admit the testimony in question, *i.e.*, Smith's testimony that he learned Wilson's real name (Rahman, not Ramel, as he

5

had believed) from Smith's girlfriend. But it further noted that the error was harmless in light of the overwhelming evidence of guilt. *See id.* A judge of the New York Court of Appeals denied leave to appeal on February 21, 2013. *People v. Wilson*, 20 N.Y.3d 1066 (2013) (Graffeo, J.).

In his petition for habeas relief, filed on May 14, 2014, Wilson raises the first two arguments he submitted to the Second Department: (1) that the prosecution failed to prove his guilt beyond a reasonable doubt and his verdict was against the weight of the evidence; and (2) that the prosecution impermissibly elicited hearsay evidence to support the testimony.[1] In his reply brief, Wilson also raises the argument that his trial and appellate counsel were ineffective.

## DISCUSSION

A.  *Standard of Review*

    1.  *Exhaustion*

The exhaustion requirement, codified at 28 U.S.C. §§ 2254(b) and (c), obligates a federal habeas petitioner to exhaust state judicial remedies before seeking relief from a federal court. To exhaust state remedies, a petitioner must "fairly present" his federal constitutional claims to the highest state court with jurisdiction over them. *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and alterations omitted); *Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*). This requirement affords the state system "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan*, 513 U.S. at 365 (quotation marks and citation omitted).

    2.  *Procedural Default and Adequate and Independent State Grounds*

A federal habeas court may not "review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question

---

[1] The petition itself is ambiguous with respect to whether Wilson is advancing in this proceeding the third and fourth claims he advanced in the Appellate Division. However, Wilson made clear at oral argument that he was not. Therefore, I will not respond to those arguments here.

and adequate to support the judgment." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) (internal quotation marks and citation omitted). The adequate and independent state ground doctrine, like the exhaustion requirement, is "grounded in concerns of comity and federalism." *Coleman*, 501 U.S. at 730. Without this doctrine, "habeas would offer state prisoners whose custody was supported by independent and adequate state grounds . . . a means to undermine the State's interest in enforcing its laws." *Id*. at 730–31.

This holds true any time "a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990); *accord Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding.") (emphasis in original). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state ground doctrine "curtails reconsideration of the federal issue on federal habeas." *Gadsden v. Lee*, No. 12-CV-4204 JG, 2013 WL 3938500, at *3 (E.D.N.Y. July 30, 2013) (quoting *Harris*, 489 U.S. at 264 n. 10).

"Before accepting a procedural bar defense, a federal court must examine the adequacy of the alleged procedural default," as "state courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (citation and quotation marks omitted). "[A] procedural bar will be deemed adequate only if it is based on a rule that is firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (citations and quotation marks omitted); *see also Lee v. Kemna*, 534 U.S. 362, 376 (2002) (same).

7

### 3. *Cause and Prejudice*

A state procedural default qualifies as an adequate and independent ground and will preclude federal habeas review "unless the habeas petitioner can show cause for the default and prejudice attributable thereto . . . or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris*, 489 U.S. at 262 (quotation marks and citations omitted); *accord Coleman*, 501 U.S. at 750. A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel," or that "some interference by officials . . . made compliance impracticable." *Murray v. Carrier*, 477 U.S. 478, 788 (1986) (quotation marks and citations omitted). A petitioner may establish prejudice by showing that the error worked to petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (quotation marks and citation omitted). Finally, if the petitioner cannot show cause and prejudice, the procedural default may nonetheless be excused if he can show that a fundamental miscarriage of justice would result from a failure to entertain the claim, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citations omitted).

### 4. *AEDPA Deference to State Court Decisions on the Merits*

If a claim is exhausted and procedural default does not apply, I will move on to consider the merits of the claim under the standard articulated in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under that standard, a federal habeas court may grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2). In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence. *Id.* § 2254(e)(1).

B.  *Wilson's Claims for Relief*

Wilson makes several arguments in support of the writ. First, he argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt. Second, he argues that his Sixth Amendment right to confrontation was violated when the trial court allowed prejudicial hearsay evidence. Respondent admits that these two claims have been exhausted because Wilson presented them to both the Second Department and New York Court of Appeals. Opp. Br. 2. Respondent argues instead that Wilson's claims are procedurally defaulted, since the Second Department found that both of the arguments were unpreserved in the trial court. *Id.* In Wilson's reply brief, he also argues that his trial and appellate counsel were ineffective.

1.  *The Sufficiency of the Evidence*

Wilson argues that the jury's verdicts were based on insufficient evidence because the testimony of the two eyewitnesses at trial was not credible and there was no physical evidence presented or evidence of motive. *See* Br. 7-12. Respondent argues this claim has been procedurally defaulted and in any event is without merit.

Even if the issue were properly preserved, the claim is clearly meritless. To overturn a conviction based on insufficiency of the evidence, a defendant must establish that, "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))

9

(additional citation omitted). "A defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden . . . ." *Dixon*, 293 F.3d at 81 (citation omitted).

Wilson fails to meet this burden. Viewing the evidence in the light most favorable to the prosecution, two eyewitnesses – Bynum and Smith – had clear views of the shooter, and they both identified Wilson as the shooter. Trial counsel had an opportunity to cross-examine both witnesses and argued all of the credibility issues that Wilson raises now. It is the province of the jury – not a trial or habeas court – to determine the reliability of witness testimony. In short, a reasonable jury could have found Wilson guilty of both murders.

Wilson's claim is also procedurally defaulted. "[F]or an argument concerning the sufficiency of the evidence to be preserved, it must be 'specifically directed' at the alleged error . . . ." *Dixon*, 293 F.3d at 80 (2d Cir. 2002) (quoting *People v. Gray*, 86 N.Y.2d 10, 19 (1995) (additional citation omitted). Wilson's trial counsel made a motion to dismiss at the close of the prosecution's case, and said "there are numerous major and various inconsistencies in the testimony from Kim Smith to James Bynum." Tr. 611. Counsel argued that Smith and Bynum's testimony were both "unbelievable," but did not elaborate further. *See* Tr. 611-12. The court denied the motion. Tr. 612-13. On appeal, Respondent argued that the issue was not preserved because defense counsel did not argue the specific inconsistencies that he mentions on appeal, including Smith's 911 call and the "purported lack of information provided by Smith in that call." Wrenn Decl. Ex. M (Resp. Br.) at 24. The Second Department found that Wilson's argument regarding insufficient evidence was unpreserved for review. *Wilson*, 955 N.Y.S.at 364.

The Second Department's decision that Wilson's claim is unpreserved rests on independent and adequate state law grounds. The decision to affirm the conviction was "independent of the claim [petitioner] raises in the instant habeas petition." *See Williams v.*

10

*Walsh*, No. 02 CIV. 7633 (HB), 2004 WL 2754859, at *3 (S.D.N.Y. Dec. 1, 2004) (citation omitted). It was a clearly stated ground based on a "firmly established and regularly followed New York procedural rule . . ." *See Garvey v. Duncan*, 485 F.3d 709, 718 (2d Cir. 2007) (referring to N.Y.C.P.L § 470.05(2)).

Moreover, the appellate court's decision does not qualify as an "exorbitant" application of the contemporaneous objection rule. *See id.* at 713-14 ("[I]n certain limited circumstances, even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'") (quoting *Lee*, 534 U.S. at 375). The motion to dismiss alerted the court generally to the issue of the unreliability of the eyewitnesses' testimony, and I might have found the issue to be adequately preserved. However, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Downs v. Lape*, 657 F.3d 97, 105 (2d Cir. 2011) (citation and internal quotation marks omitted). Finally, petitioner has not demonstrated cause or prejudice to overcome the procedural default under the standard articulated above.

### 2. *Impermissible Hearsay Testimony*

Wilson also argues that the trial court allowed impermissible hearsay testimony. *See* Br. 14-16. He contends that hearsay testimony elicited from Kim Smith – that his girlfriend told him Wilson's real first name was "Rahman" and not "Ramel" – violated his rights under the Confrontation Clause because he was not given an opportunity to cross-examine Kim Smith's girlfriend, Shameva Ector. *See id.* at 17. He also argues that the judge should have given a limiting instruction on the testimony of Kim Smith. *See id.* Respondent points out that this claim has been defaulted, and in any event any error was harmless. Opp. Br. 13-16.

I agree with the Second Department that the issue was not preserved for appellate review. *See Wilson*, 955 N.Y.S.2d at 364. Using the same standard discussed above, the

11

contemporaneous objection rule is well-established, and the Second Department's opinion clearly stated that it was relying on that rule in its decision. The questioning at issue went as follows:

> Q: Now, you testified earlier you believed his name was Ramel; correct?
> A: That's correct.
> Q: When did you learn that his name was actually Rahman?
> A: That same night when [I] went home.
> Q: From who?
> A: My girlfriend.
> Q: Now, do you know if your girlfriend [k]new the Defendant?
> A: Yes, she did.
>   Mr. Fredella: Objection.
>   Mr. Jackson: If he knows.
>   I'll withdraw the question, Judge.
>   The Court: Go ahead.
> Q: Did your girlfriend also work at the bus company?
> A: Yes, she did.
> Q: Did she work there at the same time that the Defendant did?
> A: Yes, she did.
> Q: It was she who told you his name was Rahman?
> A: That's correct.

Tr. 357. Wilson's trial attorney did not object to the hearsay testimony when it was elicited, and he did not use this as a basis for his motion to dismiss at the close of the government's evidence. *See* Tr. 357-58, 611-12. Thus, independent and adequate grounds exist for the state court's decision rejecting this claim, and Wilson has not established cause or prejudice to overcome the procedural default.

The Second Department also considered the merits of the claim. *See Wilson*, 955 N.Y.S.2d at 364. It found that the testimony at issue was inadmissible hearsay because it was "offered for its truth, i.e., to prove that the person the eyewitness saw shoot the victim was, in fact, Rahman." *Id.* Petitioner argues this error violated his Confrontation Clause rights under the Sixth Amendment. However, the Second Department found that the testimony did not violate defendant's Confrontation Clause rights because the evidence of guilt was overwhelming and

12

because "the testimony elicited by the People during direct examination did not imply that the eyewitness's girlfriend viewed the shooting and identified the defendant as the shooter, but, rather, indicated that the girlfriend merely supplied the correct name of the subject coworker." *Id.* (citation omitted).

Assuming without deciding that the admission of the challenged testimony violated petitioner's Confrontation Clause rights, I agree with the Second Department that any error was harmless. *See id.* (citation omitted). On habeas review, I use the standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), to decide whether a state court's determination of a constitutional error was harmless. *See McBee v. Burge*, 644 F. Supp. 2d 270, 284 (E.D.N.Y. 2009) (quoting *Fry v. Pliler*, 551 U.S. 112, 127 (2007)), *aff'd*, 395 F. App'x 762, 763 (2d Cir. 2010). The *Brecht* standard allows a court to grant a habeas petition only if the petitioner establishes that "the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Glenn*, 98 F.3d at 729 (quoting *Brecht*, 507 U.S. at 638 (additional citation omitted)).

Wilson has not met this standard. Kim Smith witnessed the shootings and identified the defendant, a person he knew as "Ramel," as the shooter. The fact that Smith's girlfriend later corrected Smith and told him Wilson's first name was Rahman (not Ramel) did not alter the reliability of Smith's eyewitness testimony. Smith had an independent knowledge of Wilson, who he saw daily at work. Therefore, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 638.

3. *Ineffective Assistance of Counsel*

In his reply brief, petitioner raises the issue of ineffective assistance of counsel. *See* Reply at 2. He claims his trial counsel was ineffective by failing to object to inadmissible evidence throughout the trial, and appellate counsel was ineffective for not conducting a factual

13

investigation into petitioner's innocence. *See id.* At oral argument, Wilson specified that his trial counsel was ineffective for (1) failing to object to hearsay testimony about Smith learning Wilson's real name from his girlfriend and (2) failing to call Smith's girlfriend as a witness. Also at oral argument, Wilson also dropped his claim with respect to appellate counsel.

Though the Second Department stated that Wilson was afforded the effective assistance of trial counsel, s*ee Wilson*, 955 N.Y.S.2d at 364-65l, Wilson never raised a claim of ineffective assistance of trial counsel on direct appeal or in a § 440 motion, and therefore any such claim is unexhausted. However, I can decide to consider Wilson's claim of ineffective assistance of trial counsel on the merits under 28 U.S.C. § 2254(b)(2), notwithstanding his failure to exhaust.

To establish a claim of ineffective assistance of counsel under the federal constitution, Wilson must show that (1) his counsel supplied deficient representation, and (2) Wilson suffered prejudice as a result of that deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish deficient performance, Wilson must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 687). To establish prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

As explained above, Wilson's arguments with respect to the hearsay testimony of Kim Smith are weak. There was good reason for the jury to credit Smith's eyewitness testimony that Wilson was the shooter, and that was not undermined in the slightest by Smith's testimony

14

that he learned from his girlfriend that Wilson's real first name was Rahman, not Ramel. A successful objection to the hearsay would not have established a reasonable probability of a different outcome in the case. *See Strickland*, 466 U.S. at 694. Similarly, it is unclear what aid – if any – the testimony of Kim Smith's girlfriend would have brought to Wilson's case. Merely supplying Wilson's real name would not have altered the critical facts supplied by Smith or any other witness. Wilson's arguments do not establish an ineffective assistance claim under *Strickland*, as there is no reasonable possibility the result of his trial would have been different had his counsel objected to the hearsay in question. For these reasons, Wilson's ineffective assistance claim is denied.

## CONCLUSION

For the reasons stated above, Wilson's petition is denied. Because Wilson has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.


John Gleeson, U.S.D.J.


Dated: February 10, 2015
      Brooklyn, New York